[L.A. No. 30064. In Bank. July 25, 1973.]

In re PETER DANIEL BOGART on Disbarment.

**COUNSEL**

Peter D. Bogart, in pro. per., for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be disbarred.

Petitioner was admitted to practice in this state on September 11, 1962. In 1965, he was convicted in a court trial in the Superior Court of Los Angeles County of six counts of crimes involving moral turpitude—three counts of grand theft (Pen. Code, § 487, subd. 1) and three counts of forgery of a fictitious name (Pen. Code, § 470). His motions for new trial and probation were denied, and he was sentenced to state prison on each of the six counts for the term prescribed by law, the sentences to run concurrently. The convictions were affirmed on appeal. (*People* v. *Bogart*, 7 Cal.App.3d 257 [86 Cal.Rptr. 737] (hg. den.).)

On September 25, 1970, following the finality of petitioner's convictions, he was remanded into custody to serve his state prison term; and on December 31, 1970, this court referred the matter to the State Bar for hearing, report, and recommendation as to the nature and extent of discipline to be imposed. (See Bus. & Prof. Code, §§ 6101, 6102.) After one year's incarceration in the state prison system, petitioner was admitted to parole in September 1971. Between October 20, 1971, and January 17, 1972, shortly after his release from prison, a State Bar local administrative committee conducted three hearings on the issue of discipline. Thereafter, the local committee unanimously recommended that petitioner be disbarred. On June 15, 1972, the disciplinary board held a hearing and subsequently, by a vote of 11 to 0, also recommended that petitioner be disbarred.

In the meantime, this court had on March 30, 1966, placed petitioner on suspension from the practice of law in this state until further order. (Bus. & Prof. Code, § 6102, subd. (b).) Petitioner admitted that he had received notification of the suspension early in April 1966, and records of this court show that on seven occasions since March 30, 1966, petitioner sought unsuccessfully to have this court set aside his interim suspension. (See minute orders of this court filed May 4, 1966, August 31, 1966, July 19, 1967, September 21, 1967, July 31, 1968, October 22, 1969, and November 4, 1971.) Despite the continuation of petitioner's interim suspension, however, he testified that between April 1966 and August 1970 he maintained and used an office with his name as an attorney on the front door; and documentary evidence and petitioner's own testimony disclose that in four specific matters he held himself out to clients as entitled to practice law in 1968 and thereafter and that he practiced while under suspension.

The summary contained in the findings of fact adopted by the disciplinary board sets forth the essential details with respect to the crimes of which petitioner was convicted, as follows: "The finding of the trial court showed that [petitioner] obtained merchandise from various stores and merchants through misrepresentations and assuming of fictitious name. [Petitioner] rented an apartment in an area remote from his home under a fictitious name, purchased merchandise from various stores on credit and had the merchandise delivered to said address. [Petitioner] subsequently surreptitiously removed the personal property to his home and was in possession of such various articles of merchandise at the time of [his] arrest."[1]

---

[1]More particularly, the record shows, as follows: On September 3, 1962, petitioner and his wife, posing as Frank and Beverly Gordon, rented an unfurnished one-bedroom apartment in Anaheim, signing a rental agreement therefor. (From September 1 to September 9, 1962, they lived in an apartment in Hollywood, but the middle of September moved to Sherman Oaks.) They told Mrs. Wright, one of the managers of the building, that they were going to Texas; and they left a note on the door of the apartment directing deliverymen to contact the manager to be admitted to the apartment. They never had the gas or electricity turned on in the apartment in Anaheim and did not keep any dishes, food, clothes, or bed linen in the apartment. Between September 3 and October 12, however, furniture, appliances, and household items, in an unusual quantity, were delivered to the apartment, and Mr. Wright noticed that sometimes furniture which had been delivered the preceding day was no longer in the apartment. On either October 11 or October 12, Mr. Wright saw petitioner and petitioner's wife load furniture onto a truck. During the moving process, petitioner had a sweater over the front license plate, and the rear of the truck was backed up toward the yard. After they left, nothing remained in the apartment.

The stores from which the merchandise was obtained and the value of the merchandise were, as follows: Sears, Roebuck & Company in Santa Ana ($235); Seiber

At petitioner's criminal trial, there was expert handwriting evidence to the effect that the signature on certain of the credit applications had been written by the same person responsible for the "Frank Gordon" signature on the rental agreement for the Anaheim apartment. Expert handwriting evidence was also introduced that the signature "F. Gordon" on a letter to the National Conference of Bar Examiners, dated November 27, 1961, recommending petitioner's admission to practice law in this state, was probably written by the same person who signed "Frank Gordon" to the rental agreement for the Anaheim apartment.

Despite the overwhelming evidence presented in the criminal trial that petitioner was guilty of the crimes hereinabove described, he persisted in the trial court, and has persisted in these proceedings, in claiming innocence of any wrongdoing. In the trial court, petitioner maintained that he and his wife had purchased some furniture from two clients for $2,250 in cash, but he did not identify the furniture except to say that a "dining room set" was included. He testified that he had received a bill of sale but did not have it at that time. He refused to identify the clients from whom he assertedly had bought the furniture, claiming an attorney-client privilege.

In the State Bar proceeding, petitioner made the same claim about having purchased furniture from clients for about $2,250 in cash, but for the first time he identified these clients as Mr. and Mrs. Frank Gordon. He gave details about the Gordons, indicating that Mr. Gordon had had some problems with immigration officials. He also testified that some of the furniture he had purchased from the Gordons was not fully paid for, but that he did not know it at the time he bought the various items. When questioned by his own counsel whether the furniture he allegedly purchased from the Gordons was the same furniture constituting the subject matter of his convictions, petitioner's reply was evasive, except that he admitted that the dining room set was included. He further testified that after he and his wife purchased the Gordons' furniture, the Gordons left the Los Angeles area, that he last saw them in January 1963, and that he tried to locate them in Texas but was unsuccessful.

During the State Bar proceeding, petitioner offered favorable character evidence from three attorneys, who had represented him in the criminal proceeding, but with whom he had had no recent contact. One of the

Department Store in Los Angeles ($743.55); May Company in Los Angeles ($390.52); J. W. Robinson Company in Los Angeles ($40); and Butler Brothers in Lakewood ($664.85). In each instance, credit had been established shortly before the sales transactions by either petitioner or his wife in the name of Frank Gordon, Mr. and Mrs. Frank Gordon, or Frank and Beverly Gordon.

attorneys testified that he had found petitioner to be an expert in criminal law, industrious, thoroughly reliable, and trustworthy. Another testified that from his recollection of representing petitioner on an appeal, petitioner had superior legal ability and was truthful and candid with him. The third attorney testified that he had found petitioner to be a very astute and knowledgeable student of law, with well evidenced initiative, imagination, resourcefulness, and tenacity.

Petitioner attacks the evidence supporting his convictions, the legal bases of his convictions, the conclusions reached by the disciplinary board, and even the jurisdiction of this court in disciplinary proceedings against attorneys. He further attacks the procedures followed in State Bar conviction reference proceedings and contends that the instant proceeding should be dismissed because the disciplinary proceedings were commenced only after a delay which was prejudicial to him. There is, however, no merit to any of these contentions.

■ To begin with, as has been pointed out by this court on innumerable occasions (see, e.g., *In re Plotner,* 5 Cal.3d 714, 716 (1) [97 Cal.Rptr. 193, 488 P.2d 385]), the burden is on petitioner to show that the disciplinary board's recommendation is erroneous or unlawful; and he has not met this burden.

■ The record of petitioner's convictions is "conclusive evidence of guilt" (Bus. & Prof. Code, § 6101), and it was therefore unnecessary that proof be presented in these proceedings that he committed the crimes. Nevertheless, the facts and circumstances of the crimes are relevant to determine appropriate discipline. (See Bus. & Prof. Code, § 6102, subd. (b); *In re Smith,* 67 Cal.2d 460, 462 [1b] [62 Cal.Rptr. 615, 432 P.2d 231].) Accordingly, evidence thereof was properly received.

■ Under sections 6101 and 6102 of the Business and Professions Code, disbarments, and not suspensions, have been the rule rather than the exception in cases of serious crimes involving moral turpitude, the purpose of the statutes being to protect the public, as well as the courts and the legal profession. (*In re Smith, supra,* 67 Cal.2d 460, 462 [2].)
■ The crimes of which petitioner was convicted (three counts of grand theft and three counts of forgery) are heinous crimes and warrant disbarment, no mitigating circumstances having been shown. As stated by this court in *Smith,* "Crimes of grand theft and forgery have been recognized to involve heinous misconduct for an attorney, and in *In re Urias,* 65 Cal.2d 258, 262, fn. 5 . . . we noted that 'the vast majority of grand theft convictions of attorneys since that date [1955] have resulted in disbarment or resignation with prejudice.' " (Pp. 462-463 of 67 Cal.2d.)

Furthermore, petitioner's obvious lack of candor in testifying in his criminal trial and in these proceedings and his practicing law in open defiance of this court's interim order of suspension constitute additional support for the recommendation of his disbarment.

█ Petitioner contends, in substance, that this court has no jurisdiction to consider two of the six counts of his convictions (the May Company grand theft and the J. W. Robinson Company forgery), because his acts relating to them assertedly took place a few days before he was admitted to practice on September 11, 1962. Even if the acts may have occurred before petitioner's admission to practice, however, that fact would be immaterial here, since unquestionably petitioner's *convictions* occurred in 1965, which was after he had been admitted to practice; and by the terms of sections 6100 and 6101 of the Business and Professions Code one of the causes for disbarment or suspension is *conviction* of a felony or misdemeanor involving moral turpitude occurring *after* an attorney's admission to practice.

█ Furthermore, discipline is properly imposed for acts involving moral turpitude whether or not they relate to conduct by an attorney in his professional capacity. (*In re Plotner, supra,* 5 Cal.3d 714; *Fall* v. *State Bar,* 25 Cal.2d 149, 160 [3] [153 P.2d 1].) Therefore, the fact that the act may have been committed prior to an attorney's admission to practice would appear to be irrelevant. As pointed out in *Alkow* v. *State Bar,* 3 Cal.3d 924, 936 (9) [92 Cal.Rptr. 278, 479 P.2d 638], this court's concern lies in protecting the public's right to representation by attorneys who are worthy of trust; and it would be unreasonable to assume that an attorney who, as petitioner here, was admitted to practice law in this state several days after committing a crime involving moral turpitude would have had a change in character during that brief interval and simply by reason of his taking the oath of office. In any event, it will be recalled that four of the counts on which petitioner was convicted involved acts committed by him after his admission to practice; and his disbarment is warranted by those convictions alone.

While petitioner was serving his prison term, he successfully completed several courses in legal subjects, and the Department of Corrections has so advised this court. Petitioner claims that as a result he has satisfied the provisions of section 23.9 of the Business and Professions Code, and this court cannot consider any of his criminal convictions.[2] This contention, however, is completely lacking in merit.

[2]Section 23.9 of the Business and Professions Code reads, as follows: "Notwithstanding any other provision of this code, any individual who, while imprisoned in a state prison or other correctional institution, is trained, in the course of a rehabilita-

To begin with, petitioner did not receive his professional training in prison, and no right to qualify for an examination for admission to practice is here involved. In any event, the right referred to in the cited section is conditioned on a finding by the licensing agency, upon recommendation of the Adult Authority or the Department of the Youth Authority, as the case may be, that the person released from prison after having received training in a particular skill, occupation, or profession is a fit person to be licensed. ■ The section cannot be interpreted to impose limitations on the inherent powers of this court over matters of admission, discipline, and reinstatement of attorneys. (See *Brotsky* v. *State Bar,* 57 Cal.2d 287, 300-301 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 310]; *In re Lavine,* 2 Cal.2d 324, 329 [7] [41 P.2d 161, 42 P.2d 311].)

Petitioner makes various constitutional claims essentially attacking, in substance, the validity of his interim suspension and the court's jurisdiction in conviction reference proceedings. These claims are a repetition of similar claims made by him on the seven occasions of his attacks on his interim suspension. On each of those occasions, this court considered petitioner's contentions and resolved them against him. Likewise, on three occasions the Supreme Court of the United States denied petitioner any relief. (See *Bogart* v. *State Bar,* 390 U.S. 37 [19 L.Ed.2d 814, 88 S.Ct. 837]; *Bogart* v. *Reagan,* 386 U.S. 211 [17 L.Ed.2d 871, 87 S.Ct. 979]; *Bogart* v. *Traynor,* 385 U.S. 451 [17 L.Ed.2d 514, 87 S.Ct. 614], rehg. den., 386 U.S. 939 [17 L.Ed.2d 812, 87 S.Ct. 960].)

As hereinabove indicated, petitioner attacks the procedures followed in State Bar conviction reference proceedings and contends that the instant proceeding should be dismissed because the disciplinary proceedings were commenced only after a delay which was prejudical to him. With respect to the latter contention, it should be noted that the length of petitioner's interim suspension was due largely to the passage of time before his conviction (evidencing moral turpitude) became final; and petitioner's own decision to pursue protracted collateral proceedings,

---

tion program approved by the particular licensing agency concerned and provided by the prison or other correctional institution, in a particular skill, occupation, or profession for which a state license, certificate, or other evidence of proficiency is required by this code shall not, when released from the prison or institution, be denied the right to take the next regularly scheduled state examination or any examination thereafter required to obtain the license, certificate, or other evidence of proficiency and shall not be denied such license, certificate, or other evidence of proficiency, because of his imprisonment or the conviction from which the imprisonment resulted, or because he obtained his training in prison or in the correctional institution, if the licensing agency, upon recommendation of the Adult Authority or the Department of the Youth Authority, as the case may be, finds that he is a fit person to be licensed."

instead of expediting his direct appeal, was principally responsible for the delay.[3] He also delayed his own criminal trial with pretrial collateral proceedings.

The present proceeding is a "conviction reference" proceeding pursuant to article 6 of the State Bar Act (Bus. & Prof. Code, § 6100 et seq.), entitled "Disciplinary Authority of the Courts." In March 1966, following petitioner's convictions in the criminal proceedings, the State Bar transmitted to this court the record of those convictions for consideration under sections 6101 and 6102 of the Business and Professions Code. On March 30, 1966, this court determined that petitioner's convictions involved moral turpitude as a matter of law, noted that petitioner had taken an appeal from his convictions, and placed him on suspension until further order.

After petitioner's convictions had become final, this court afforded him an opportunity to show cause in writing why a "final" disciplinary order should not be made, but he failed to respond. Thereafter, on December 3, 1970, this court referred petitioner's convictions to the State Bar for a hearing limited to the issue of the nature and extent of discipline to be imposed by the court. (See Cal. Rules of Court, rule 951(b), (c).) Following this court's December 3, 1970, order of reference, the State Bar proceedings were conducted expeditiously, yet fairly, to afford petitioner the assistance of counsel, full discovery, and additional time in which to present fully his claims.[4]

---

[3]Due to the many collateral proceedings instituted by petitioner, he did not file his opening brief in his direct appeal from his convictions until July 26, 1968, over three years after he was convicted. After the filing of a brief by the Attorney General and a reply brief by petitioner, the Court of Appeal on May 5, 1970, affirmed the convictions. (*People* v. *Bogart, supra,* 7 Cal.App.3d 257.) On May 25, 1970, the Court of Appeal denied a petition for rehearing, and petitioner's petition for hearing in this court was denied July 1, 1970.

[4]The record shows that between September 25, 1970, and June 15, 1971, after petitioner's convictions became final, he was incarcerated in Department of Corrections facilities at Chino and Vacaville; that on June 15, 1971, petitioner was placed in the Department of Corrections' Southern Conservation Center, Chino, on a work-furlough program; that on July 9, 1971, while petitioner was on the work-furlough program, he was served with a notice of a State Bar hearing on the issue referred by this court; that after July 9, 1971, petitioner received the full time period for prehearing discovery permitted by the Rules of Procedure of the State Bar to the parties to this conviction reference proceeding (see Rules of Procedure of the State Bar, rules 14-14.20, foll. Bus. & Prof. Code, § 6087); that between August 2 and October 19, 1971, active discovery was conducted by petitioner and by the State Bar Examiner; that State Bar hearings were held October 20 and December 10, 1971, on petitioner's motion for appointment of counsel and on his prehearing motions attacking the validity of his convictions and for further responses by the State Bar Examiner to certain of petitioner's interrogatories; that after a further trial com-

It is ordered that petitioner be disbarred and that his name be stricken from the roll of attorneys, effective 30 days after the filing of this opinion.

Wright, C. J., did not participate.

Petitioner's application for a rehearing was denied August 22, 1973. Wright, C. J., did not participate therein.

---

mittee hearing on January 17, 1972, the committee unanimously recommended that petitioner be disbarred; and that the disciplinary board heard the matter on June 15, 1972, and by a vote to 11 to 0 also recommended petitioner's disbarment.